IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DEAN JARAMILLO,

       Plaintiff,

vs.                               No. CIV 01-0495 DJS/RLP

STATE OF NEW MEXICO,
NEW MEXICO MINERAL AND
NATURAL RESOURCES, NEW
MEXICO FORESTRY DIVISION,

       Defendant.


## MEMORANDUM OPINION AND ORDER

       **THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment **[Doc. No. 45]**, filed July 21, 2003.  Plaintiff brought the present action against Defendant State of New Mexico pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, asserting claims for gender and national origin discrimination, constructive discharge, and retaliation. Plaintiff also asserts state claims for breach of employment contract and breach of implied covenant of good faith and fair dealing.  Defendant New Mexico Forestry Division moves the Court for summary judgment on all counts of Plaintiff's Complaint.  Having reviewed the motion, the memoranda in support and in opposition, and the applicable law, the Court finds that the motion should be granted in part and denied in part.

## I.  Factual Background

       Plaintiff was a Forester I with the New Mexico Forestry Division (NMFD) since August 23, 1997.  Compl. ¶ 6.  Plaintiff worked as an Inmate Work Camp Supervisor.  *Id.*  Defendant

Brian Henington was the Camp Supervisor for NMFD Inmate Work Camp (IWC) Program and

Plaintiff's supervisor.  Prior to Defendant Henington becoming Plaintiff's supervisor, Plaintiff's

previous supervisors gave him excellent Performance Appraisal and Development (PAD) Reviews.

Pl.'s Resp., Ex. 1, Jaramillo Dep. p. 143.

On January 6, 1999, Defendant Henington sent Plaintiff a Memorandum.  Def.'s Mem.

Supp. Summ. J., Ex. 3.  The Memorandum addressed Defendant Henington's concerns regarding

Plaintiff's violation of two policies.  According to Defendant Henington, Plaintiff had violated the

IWC Policies and Procedures Manual1998, Section 5.5.7.  Section 5.5.7 requires crew supervisors

to "formally count inmates on their crews at the point of departure from the camp, at the mid-day

meal, when moving from one work site to another, and at the time of departure to return to the

camp and at the camp."  *Id.*  Defendant Henington informed Plaintiff he had violated this policy on

January 6, 1999, when he failed to notify dispatch of his inmate count when he left for the project.

*Id.*  Defendant Henington warned Plaintiff he would not tolerate another violation of this policy by

Plaintiff in the future.

Defendant Henington also accused Plaintiff of unprofessional conduct.  In the

Memorandum, Defendant Henington reiterated an occurrence that took place on January 4, 1999.

According to Defendant Henington, on that day, he had notified all employees to attend an

afternoon briefing.  Before beginning the briefing, Defendant Henington noticed another crew

supervisor was absent from the meeting.  When Defendant Henington asked where the crew

supervisor was, Plaintiff responded, "I will get him out from under your desk."  *Id.*  Defendant

Henington perceived this statement as a direct violation of the Energy, Minerals and Natural

Resources Department (EMNRD) Policy and Procedures Sexual Harassment Policy.  Defendant

Henington warned Plaintiff the EMNRD would not tolerate "any comment, action or behavior that relates, or can be perceived as sexual harassment." *Id.*

However, Plaintiff asserts Defendant Henington overlooked Shelby Martin's unprofessional behavior. Pl.'s Resp., Ex. 1, Jaramillo Dep. p.113-116, 121-123. Mr. Martin, Plaintiff's coworker, was known to openly use foul language, cuss, and use inappropriate "gestures." Even though some of Mr. Martin's language could be considered sexually harassing, Defendant Henington did not reprimand him. *Id.* at 115. Plaintiff contends Mr. Martin often engaged in this type of behavior. Plaintiff provided specific instances of Mr. Martin's behavior. For example, at an informal mediation meeting held to address complaints by Hispanic employees regarding Defendant Henington's discriminatory treatment toward them, Mr. Martin stood up, stated he did not give a F– if anyone liked it and "flipped the finger" at the group. However, he was not reprimanded. *Id.*, p. 108-09. The State Forester attended this mediation meeting.

On January 19, 1999, Defendant Henington sent Plaintiff a Memorandum addressing a second violation of the IWC Policies and Procedural Manual. According to Defendant Henington, Plaintiff failed to "formally count inmates" and failed "to notify the camp dispatcher of the number of inmates and their destination" in violation of Sections 5.5.7 and 6.1, respectively. Def.'s Mem. Supp. Summ. J., Ex. 4. Plaintiff signed this Memorandum on February 2, 1999. *Id.* However, Plaintiff noted on the Memorandum, "Look at the radio log. Other people have violated this policy. Even when Brian took the calls. But he doesn't take any disciplinary action against them." *Id.*

On June 11, 1999, Plaintiff submitted a "To Whom It May Concern" Memorandum addressing a conflict that occurred with Mr. Martin on June 6, 1999. Def.'s Mem. Supp. Summ. J.,

Ex. 5.   In this Memorandum, Plaintiff discussed the conflict and opined Mr. Martin had behaved

unprofessionally.   This particular incident concerned a pair of gloves with the name "Sam" on

them.   Plaintiff asked Mr. Martin if he knew who Sam was.   Mr. Martin answered, "No, but I'll

keep the gloves."   Later that day, Plaintiff addressed Mr. Martin as "Sam."   Mr. Martin "went

ballistic" and cussed and verbally assaulted Plaintiff.   Pl.'s Resp., Ex. 1, Jaramillo Dep. p. 38-40.

Plaintiff filed a complaint, but Mr. Martin continued badgering Plaintiff by using foul language,

essentially verbally assaulting him.   Although Plaintiff complained to Defendant Henington and

Defendant Henington witnessed the verbal assaults, Mr. Martin's behavior continued.   Defendant

Henington took no action to stop the harassing behavior.

On November 16, 1999, Defendant Henington sent Plaintiff a Letter of Reprimand.   Def.'s

Mem. Supp. Summ. J., Ex. 8.   Defendant Henington charged Plaintiff with "inappropriate

behavior" justifying disciplinary action.   According to the letter of Reprimand, Plaintiff violated

EMNRD policy when he "whited-out" a leave form and changed the forty (40) hours of annual

leave he had requested to thirty hours (30).   *Id.*   Defendant Henington advised Plaintiff that

"changing the time sheet without [his] approval constituted falsification of official

documentation."   *Id.*

Defendant Henington also charged Plaintiff with taking leave without authorization on

November 12, 1999.   Defendant Henington advised Plaintiff he did not have prior authorization

for leave on that day.   Therefore, Defendant Henington considered that day as "absent without

leave."   *Id.*   According to Defendant Henington, "being absent without leave" also was a separate

basis for disciplinary action.   Defendant Henington informed Plaintiff he would not be paid for

November 12th or for November 11, 1999, Veterans Day.   Defendant Henington warned Plaintiff

4

his "continued failure to comply with EMNRD and IWC policy would result in more severe disciplinary action up to and including [his] suspension or dismissal as a Forester 1." *Id.*

When Defendant Henington served Plaintiff with the letter of reprimand for being absent without leave, Plaintiff disputed the facts and refused to sign the letter. *See* Pl.'s Resp., Ex 1, Jaramillo Dep. p. 46-52. Defendant Henington stormed out of his office and directed Jill Bertram, the Camp Administrator, to come into his office and witness that Plaintiff had refused to sign the letter of reprimand. Plaintiff then asked if he could leave. Plaintiff left Defendant Henington's office and returned to his desk.

According to Plaintiff, it was at the end of the workday. He only had to wait for approximately four minutes before he could go home. However, Defendant Henington came out of his office and directed Plaintiff to go home because he appeared upset. Plaintiff did as Defendant Henington directed and went home. Later that day, Plaintiff received a call from Assistant Supervisor Rubina Vialpando. Ms. Vialpando told Plaintiff she was calling as his supervisor because she was concerned about him. Ms. Vialpando informed Plaintiff that, after he left the office, Defendant Henington had walked into her office and told her Plaintiff was very upset and had made a comment that he was going to bring a gun the next day and shoot everybody.

Plaintiff denied making such a statement and told Ms. Vialpando Defendant Henington was lying. Plaintiff commented to Ms. Vialpando that it was just another one of Defendant Henington's attempts to get him. Plaintiff called Defendant Henington's cell telephone number and questioned him about what he said to Ms. Vialpando. Defendant Henington hung up on Plaintiff. Plaintiff then called the State Forester and gave him the information. The State Forester

told Plaintiff he would look into the matter.  Defendant Henington called Plaintiff later and told

him he had "lost" his cell telephone connection.  Plaintiff asked Defendant Henington about the

information he had given Ms. Vialpando regarding Plaintiff bringing a gun and planning to shoot

everybody.  Defendant Henington denied making the statement.

The following day only Ivan Santistevan was in the office.  Plaintiff inquired about the

absent workers.  Mr. Santistevan told Plaintiff, "Don't you know?  You were supposed to come

in and shoot everybody."  Plaintiff told Mr. Santistevan he had never made the statement.

Plaintiff called the State Forester.  The State Forester told Plaintiff he would investigate the

matter.  However, the matter was never investigated, Plaintiff was never questioned about the

statement, he was never reprimanded, and he was never offered any counseling to address the

incident.  A year later, Defendant Henington used this "gun incident" to support his negative

evaluation of Plaintiff's annual PAD review.  On the PAD review form, Defendant Henington

noted Ms. Bertram had reported to him that she had overheard Plaintiff tell another coworker he

was going to bring in a gun and shoot everybody.

On November 24, 1999, Plaintiff submitted a Memorandum in response to Defendant

Henington's November 16, 1999 Letter of Reprimand.  Def.'s Mem. Supp. Summ. J., Ex. 9.

Plaintiff's Memorandum was addressed to the State Forester.  Plaintiff asserted he had not violated

any policies or procedures and explained his actions.  According to Plaintiff, Ms. Bertram whited-

out his leave slip and instructed him on the proper way to complete it.  As to the "leave without

pay" incident, Plaintiff explained he had called Ms. Bertram and informed her he would not be

going to work that day.  Plaintiff also listed the individuals he called and explained the steps he

took to insure he acted properly.  *Id.*  Ms. Bertram also noted on Plaintiff's leave form that she had

whited-out the leave form and made the changes.  *See* Pl.'s Resp., Ex. 1, Jaramillo Dep. p. 63-64.

Nonetheless, Defendant Henington reprimanded Plaintiff and did not reprimand Ms. Bertram.

On **June 9, 1999**,[1] Defendant Henington sent Plaintiff a Revised Letter of Reprimand.

Def.'s Mem. Supp. Summ. J., Ex. 13.  In this letter, Defendant Henington responded to the issues

Plaintiff raised in his December 7, 1999 Memorandum.  Defendant Henington continued to charge

Plaintiff with whiting-out and changing his time sheet.  Defendant Henington advised Plaintiff that

"changing a time sheet without approval leaves you open to charges of fraud and the like."  *Id.*  As

to the charge that Plaintiff was absent without authorization on November 12, 1999, Defendant

Henington acknowledged Plaintiff made "some effort to discuss the leave situation."  *Id.*

Nonetheless, Defendant Henington made clear that in the future Plaintiff needed advance approval

from him when he wished to take annual leave or compensatory time.  In the event Defendant

Henington was unavailable, Plaintiff was to contact "the individual [Defendant Henington] ha[d]

designated to be in charge."  *Id.*  If the designated individual was not available, then Plaintiff was

to contact the Resource Development Chief in Santa Fe or the State Forester if necessary.  *Id.*

Ultimately, Defendant Henington informed Plaintiff he was no longer considered "absent without

leave" on November 12, 1999.  However, the Revised Letter of Reprimand was to remain in

Plaintiff's file until May16, 2000.

On December 7, 1999, Plaintiff sent Defendant Henington a Memorandum responding to

Defendant Henington's request that Plaintiff submit a "Leave Request Form" for November 2,

1999.  Def.'s Mem. Supp. Summ. J., Ex. 10.  Plaintiff explained he had spoken to Louella Valerio

---

[1] Although this Revised Letter of Reprimand is dated June 9, 1999, it addresses events
that occurred on November 12, 1999.  In addition, Plaintiff signed the Letter of Reprimand on
January 5, 2000.

with Personnel, and she advised him that another leave request form was not necessary.  Defendant

Henington made several similar requests even though Plaintiff had already explained the

circumstances.

On December 16, 1999, Defendant Henington sent Ms. Bertram a Memorandum setting

forth the standard for IWC payroll and clarifying her role regarding payroll.  Def.'s Mem. Supp.

Summ. J., Ex. 11.  This Memorandum was not a reprimand.  Specifically, Defendant Henington

directed Ms. Bertram not to use liquid paper on time sheets or leave request forms and not to make

corrections on approved leave forms.  *Id.*  Defendant Henington explained to Ms. Bertram that any

adjustment to an already approved leave form required his signature.  Additionally, Defendant

Henington informed Ms. Bertram she had no "authority to add, remove, or modify hours on the

leave request form or overtime/compensatory time earned form."  *Id.*  Defendant Henington

identified the Resource Development Bureau Chief as having the authority to sign time sheets and

approve leave or overtime in Defendant Henington's absence.

On January 4, 2000, Plaintiff sent a Memorandum to Defendant Henington requesting

information regarding three training nomination forms he had submitted on October 29, 1999.

Def.'s Mem. Supp. Summ. J., Ex. 12.  According to Plaintiff's Memorandum, Defendant

Henington returned the forms to him and directed him to give them to Ms. Bertram so she could

fax them to the appropriate agencies.  Defendant Henington also informed Plaintiff he would

approve the training if funds were available.  Almost two months later, Plaintiff called two of the

sponsors for the training programs.  Both sponsors informed Plaintiff they had not received the

training nomination forms.

When Plaintiff learned other individuals were approved to attend the training programs for which he had submitted training nomination forms, he asked Defendant Henington why he had not submitted his forms.  Defendant Henington responded he had forgotten to do so.  Pl.'s Response, Ex.1, Jaramillo Dep. p. 88.  Defendant Henington also concealed opportunities for training programs by not posting the announcements for training programs even though he was required to do so.  *Id.* at 91.  Plaintiff would not learn about these training programs until the individuals Defendant Henington selected returned from the training program.  *Id.*

On January 11, 2000, Plaintiff sent Defendant Henington a Memorandum in response to the Revised Letter of Reprimand.  Def.'s Mem. Supp. Summ. J., Ex. 14.  Plaintiff argued for a dismissal of the reprimand in its entirety.  Plaintiff also reiterated his position regarding the white-out and the changes made to his leave slip.  Plaintiff did not accept Defendant Henington's version of the facts.  Plaintiff also addressed a January 5, 2000 meeting held before the State Forester  to discuss Defendant Henington's Revised Letter of Reprimand.  Plaintiff complained he had requested a formal apology from Defendant Henington for making false accusations against him and had not received one.  Plaintiff claimed Defendant Henington had accused him of threatening the staff at the Los Lunas Forestry Division with deadly force.  *Id.*  Plaintiff informed Defendant Henington he would pursue administrative remedies if necessary.

On February 22, 2000, Plaintiff sent Defendant Henington a Memorandum regarding "respect."  Def.'s Mem. Supp. Summ. J., Ex. 15.  In his Memorandum, Plaintiff expressed his disappointment in not receiving any expression of appreciation from Defendant Henington for Plaintiff and his crew building a greenhouse for the Forestry Division Seedling Program.  Plaintiff, his crew, and another NMFD employee were assigned the construction of a greenhouse.  Pl.'s

Resp., Ex. 1, Jaramillo Dep. p. 79-81.  When the greenhouse was finished, officials in Santa Fe

scheduled a ceremony to acknowledge the individuals who participated in building the

greenhouse.  *Id.* at p. 79.  Plaintiff and his crew cleaned and sanitized the greenhouse in

preparation for the ceremony.  One day after the greenhouse was cleaned, sanitized, and prepared

for the ceremony, Defendant Henington brought his two dogs from his home and left them in the

greenhouse overnight.  Defendant Henington also shoved poles through the ventilation system to

allow airflow for the dogs.  The dogs defecated in the greenhouse and chewed several of the plastic

panels.  According to Plaintiff, Defendant Henington's acts were intentional and a form of

harassment because he knew it would upset Plaintiff.  In his Memorandum, Plaintiff requested

Defendant Henington show him courtesy and respect.  Plaintiff sent a copy of this Memorandum to

the State Forester.

On March 6, 2000, Defendant Henington sent Plaintiff a Memorandum addressing

Plaintiff's failure of course S-390, Introduction to Wildland Fire Behavior Calculations, a course

sponsored by the National Parks Service.  Def.'s Mem. Supp. Summ. J., Ex. 16.  Plaintiff attended

this course from February 29th through March 2, 2000.  To be considered passing and to receive a

certificate for the course, Plaintiff had to correctly answer at least 80% of the questions on the final

test.  Defendant Henington informed Plaintiff the instructor had discussed the possibility of having

Plaintiff retake the test.  However, Defendant Henington informed Plaintiff that "as the chairperson

of the Wildland Fire Qualifications Committee, the Forestry Division's Training Program Director

and the IWC Unit Leader," he had made the "decision that [Plaintiff] would not be allowed to

retake the test."  *Id.*  However, when Mr. Martin failed his test at the Engine Academy, Defendant

Henington allowed him to retake the test without question.  Pl.'s Resp., Ex. 1, Jarmarillo Dep. p.

94.  Defendant Henington also advised Plaintiff he could retake the course when it was offered

again.  Def.'s Mem. Supp. Summ. J., Ex. 16.

Defendant Henington also "decided to allow [Plaintiff] to take the [S-336, Advanced Fire

Suppression Tactics] course, but not receive a certificate for it."  *Id*.  Plaintiff would receive a

certificate for S-336 after he passed S-390 and after Defendant Henington "suggested" it to the

instructor.  Again, Defendant Henington allowed Mr. Martin to take the S-336 before he had even

taken the S-390 course, a prerequisite to taking the S-336 course.  Pl.'s Resp., Ex.1, Jaramillo Dep.

p. 86.

On March 9, 2000, Defendant Henington sent Plaintiff another Memorandum addressing

Plaintiff's failure of another course, S-390 Intermediate Fire Behavior.  Def.'s Mem. Supp. Summ.

J., Ex. 17.  Defendant Henington informed Plaintiff he would not allow Plaintiff to attend any more

advanced wildland fire suppression courses until he successfully passed S-390 Intermediate Fire

Behavior.  *Id.*  Defendant Henington did not allow Plaintiff to retake the test for this course either

and required him to retake the entire course when it was offered.  Defendant Henington

recommended Plaintiff participate in as many Fire Fighter Type I and II assignments because in his

"professional opinion [Plaintiff] need[ed] to receive more experience in different wildfire sizes,

fuel types, and organizational levels."  Def.'s Mem. Supp. Summ. J., Ex. 16.

In late March or early April 2000, Defendant Henington performed an Interim Evaluation

of Plaintiff for the period of August 1999 to March 2000.  Def.'s Mem. Supp. Summ. J., Ex. 18.

The PAD Interim Review Form provides the evaluator four rating categories from which to rate an

employee in four Job Assignments.  These ratings are: (1) Exceeds expectations: (2) Meets

Expectations; (3) Needs Improvement; and (4) Unacceptable.  *Id.*  Nonetheless, in evaluating

Plaintiff, Defendant Henington did not adhere to the NMFD's PAD Interim Review Form rating categories and created his own rating system.  Between the "Meets Expectations" category and the "Needs Improvement" category, Defendant Henington created another category.  On the PAD Interim Review form, Defendant Henington wrote "Low M," presumably indicating Plaintiff did meet expectations but at a lower level.  *Id.*  Between the "Meets Expectations" and "Needs Improvement," Defendant Henington created a category of  "Low N," presumably indicating Plaintiff really needed improvement.  Defendant Henington rated Plaintiff as "Low M" on two Job Assignments and a "Low N" in one Job Assignment.  Significantly, Defendant Henington wrote under Job Assignment No. 3, "Dean participated in S-390 and failed the exam.  Talking to the instructor, Tim Stubbs, recommended that Dean has (sic) more fire experience.  I have assigned Dean extra duties of taking as many type 2 firefighter assignments as he can to strengthen his experience."  *Id.*  This statement contradicted Defendant Henington's March 6, 2000 Memorandum.  In the March 6, 2000 Memorandum, Defendant Henington stated Mr. Stubbs had discussed the possibility of having Plaintiff retake the test.  *See* Def.'s Mem. Supp. Summ. J., Ex. 16.  Moreover, the March 6, 2000 Memorandum did not mention Mr. Stubbs recommending Plaintiff have more fire experience.  To the contrary, Defendant Henington made it clear in the Memorandum that it was his recommendation for Plaintiff to have more fire experience.

On the Interim Review of Performance Competencies, Defendant Henington rated Plaintiff on six Competencies.  Defendant Henington rated Plaintiff "Unacceptable" for Competency No. 2– Teamwork.  Defendant Henington rated Plaintiff as "Needs Improvement" on Competency No. 1– Customer Service, Competency No. 3– Mission Focus, Competency No. 4– Adherence to Policy, Competency No. 5– Adaptability, and Competency No. 6– Self Control/Stress.  Defendant

Henington attached a separate document setting forth his rationale for his ratings to the PAD

Interim Review Form and the Interim Review of Performance Competencies form.

On May 7, 2000, Plaintiff sent Defendant Henington a Memorandum addressing his

concerns about the building of a pole shed and a cache he had volunteered to construct.  Def.'s

Mem. Supp. Summ. J., Ex. 19.  Apparently, on May 3, 2000, Defendant Henington advised

Plaintiff the project would be built the following year due to lack of funding.  The money approved

for the pole shed and the cache was $10,000.  *Id.*  Plaintiff was upset because Defendant

Henington had received $10,000 to build a cache and assigned the project to someone else.

Plaintiff expressed his disappointment because of the time he spent designing the pole shed project

and cache.  Plaintiff informed Defendant Henington that most of the time spent designing and

gathering quotes for the project was his own time.  Plaintiff also complained about how unfairly

Defendant Henington treated him and listed some instances to support his claim.  In his

Memorandum, Plaintiff asked Defendant Henington,"How long is this unfair treatment going to

continue?  All I want to do is my job and have a little moral support from my supervisor.  Now is

that too much to ask for?"  *Id.*

On May 8, 2000, Plaintiff responded to the PAD Interim Review.   Def.'s Mem. Supp.

Summ. J., Ex. 20.  Plaintiff addressed each "Job Assignment" category and "Competencies" and

explained why he disagreed with the rating Defendant Henington assigned him.  Notably,

throughout most of Plaintiff's Memorandum, Plaintiff listed several instances where Defendant

Henington treated him differently from others.  Plaintiff described Defendant Henington's actions

toward him as "harassment" and "discrimination based on his race."  *Id.*

13

On May 9, 2000, Plaintiff wrote a Memorandum to Defendant Henington regarding his "Red-card" qualifications. Def.'s Mem. Supp. Summ. J., Ex. 21. Defendant Henington had certified Plaintiff as a FFT2 based on Plaintiff not having his certified task books for his FFT1, FFT2 or Crew Boss assignments. Plaintiff informed Defendant Henington he had turned in all his task books to him the previous year. However, Defendant Henington did not know what "happened to them." Plaintiff questioned why Defendant Henington could not refer to his 1999 task books since they should have been filed. Since Defendant Henington rejected this request, Plaintiff informed Defendant Henington that he found his 1998 task book and attempted to reconstruct his assignments but could not recall all assignments or supervisors. Plaintiff requested Defendant Henington sign the 1998 task book since he was the one that made all of Plaintiff's assignments. Defendant Henington refused to sign the 1998 task book and dropped Plaintiff's qualifications to a FFT2. Plaintiff questioned how he could be Red Carded one year and dropped to a FFT2 the next. Plaintiff also questioned why he was being punished when he was not the one who lost his task books. Plaintiff complained about Defendant Henington posting Plaintiff's 2000 Wildland Fire Qualifications and then also placing a copy in every employees' mailbox. Plaintiff felt this action was meant to embarrass and harass him. Finally, Plaintiff listed several instances when Defendant Henington treated him in what he perceived as discriminatory, harassing, and retaliatory.

On June 6, 2000, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. Def.'s Mem. Supp. Summ. J., Ex. 22.

In July 2000, Defendant Henington completed Plaintiff's annual PAD review for the period from August 1999 to August 2000. Def.'s Mem. Supp. Summ. J., Ex. 23. Defendant Henington

14

rated Plaintiff as "Unacceptable" in the Teamwork competency area.  Defendant Henington also

applied his <u>own rating</u> of  "Low M" for Plaintiff's overall job competency rating.  Once again,

Defendant Henington attached a separate document detailing his rationale for his ratings.

Specifically, in support of his rating Plaintiff Unacceptable in the Teamwork competency area,

Defendant Henington wrote, "I have seen no attempt by you on trying to improve your working

relationships, communication and cooperation with all IWC employees.  You have cussed at

employees on at least two different occasions, and threaten people with blackmail (you have made

it clear that you are recording or writing down what people say)."  *Id.*

On July 23, 2000, Plaintiff sent Defendant Henington a Memorandum addressing his

annual PAD review.  Def.'s Mem. Supp. Summ. J., Ex. 24.  Plaintiff informed Defendant

Henington he would not be attending his scheduled annual PAD review.  In support of his

position, Plaintiff explained he felt uncomfortable having Defendant Henington evaluate him due

to their ongoing conflict, a pending mediation meeting, and Defendant Henington's failure to

follow proper procedures in his interim evaluation.  Plaintiff requested Rubina Vialpando, IWC

Assistant Unit Leader at that time, "close out his PAD."  *Id.*

On August 7, 2000, Plaintiff sent a Memorandum to the Division Director requesting

information on how to appeal his annual PAD review.  Def.'s Mem. Supp. Summ. J., Ex. 25.

Plaintiff disagreed with Defendant Henington rating him Unacceptable in the Teamwork

Competency area.  Plaintiff also disputed Defendant Henington's allegation that Plaintiff was

blackmailing coworkers or that he was recording or documenting what people said.  Plaintiff

challenged Defendant Henington to prove his allegations.

15

On September 7, 2000, Plaintiff submitted his letter of resignation.  Def.'s Mem. Supp. Summ. J., Ex. 1.   In his resignation letter, Plaintiff indicated he was being "pressured out of the system due to unfair treatment, discrimination, retaliation and harassment" and considered it constructive discharge.  *Id.*  Prior to his resignation, Plaintiff applied for other state government positions in the summer of 2000.  Def.'s Mem. Supp. Summ. J., Ex. 2, Jaramillo Dep. at 20-22. Although Plaintiff was not offered every position he applied for, eventually he did receive an offer for another state government position and resigned his Forestry 1 position after accepting the offer. *Id.*, at 21.

## II.  Summary Judgment Standard

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  Summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, as well as any affidavits "show that there is no genuine issue as to any material fact . . . . " *Id.*  When applying this standard, the Court examines the record and reasonable inferences in the light most favorable to the non-moving party.  *Universal Money Ctrs., Inc. v. American Tel. &Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994).

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289 (1968)).  The movant's initial burden may be discharged by showing there is an absence of

16

evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  Once the movant meets its burden, the burden shifts to the non-moving party to

demonstrate a genuine issue for trial on a material matter.  *Bacchus Indus., Inc. v. Arvin Indus.,*

*Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

If the moving party satisfies its initial burden, the party opposing the motion for summary

judgment may not rest upon mere allegations or denials in the pleadings, but must set forth

specific facts showing there is a genuine issue for trial as to a dispositive matter for which it

carries the burden of proof.  *Universal Money Ctrs., Inc.*, 22 F.3d at 1529.  It is not sufficient "to

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co.*, 475 U.S. at 586.  An issue of material fact is genuine if a reasonable jury could return

a verdict for the party opposing the motion. *Universal Money Ctrs., Inc.,* 22 F.3d at 1529.  The

mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient to

defeat a properly supported motion for summary judgment.  *Id.*

### III.  Discussion

#### A.  Title VII Claims

##### 1.  Title VII National Origin Claim

Plaintiff brought this civil rights action pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e *et seq.*, asserting claims for gender and national origin discrimination,

retaliation, and constructive discharge.  Title VII makes it an "unlawful employment practice for an

employer to . . . discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can prove his Title VII claim of unlawful

employment discrimination through either direct or circumstantial evidence.  *Kendrick v. Penske Transp. Servs. Inc*.,  220 F.3d 1220, 1225 (10th Cir. 2000).  Direct evidence of discrimination can be established by a written or oral statement by the defendant of discriminatory motive.  *Id*.  When a plaintiff relies on circumstantial evidence to prove his claim of unlawful employment discrimination, the Court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

The Court will analyze Plaintiff's claims under the *McDonnell Douglas* three-step burden-shifting framework because he has offered no direct evidence of discrimination.  Under this framework, the plaintiff carries the initial burden of establishing a *prima facie* case of racial discrimination.  *Id.* at 802.  Once the plaintiff has established a *prima facie* case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its employment action.  *Id.*  If the defendant makes this showing, the plaintiff must then show that the defendant's justification is pretextual.  *Id.* at 804.

In *McDonnell Douglas*, the Court recognized that the *prima facie* test might vary somewhat depending on the context of the claim and the nature of the adverse employment action alleged.  *Id.* at 802.  Nonetheless, "[t]he critical *prima facie* inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Kendrick*, 220 F.3d at 1227 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Therefore, to establish a *prima facie* case of racial discrimination, Plaintiff  must show (1) he belongs to a protected class; (2) he was qualified and satisfactorily performing his job; (3) despite his qualifications he was discharged; and (4) the job was not eliminated after his discharge.

*See Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).  In this case, Plaintiff is Hispanic and belongs to a protected class.  Defendant NMFD employed Plaintiff since 1997 and despite his qualifications he was discharged.  After Plaintiff's discharge, his job was not eliminated.

Defendant NMFD argues that Plaintiff cannot establish a *prima facie* case of racial discrimination because he was not discharged.  Defendant NMFD also argues that each of Plaintiff's claims of discrimination "do not involve an adverse employment action."  Def.'s Mem. Supp. Mot. Summ. J. at 13.  Finally, Defendant NMFD contends "the decisions by the Forestry Division underlying each of [Plaintiff's] claims are amply supported by a legitimate business reasons (sic)."  *Id.*  In order to address Plaintiff's Title VII racial discrimination claim, the Court must first address Plaintiff's Title VII constructive discharge claim.  If Plaintiff's Title VII constructive discharge claim fails, he cannot prevail on his Title VII racial discrimination claim.

### 2.  Title VII Constructive Discharge Claim

Although Plaintiff resigned, he contends he was constructively discharged because he was subjected to a hostile work environment.  Defendant NMFD counters Plaintiff "completely controlled every aspect of his resignation" and therefore he was not constructively discharged.  Def.'s Mem. Supp. Mot. Summ. J. at 7.  In addition, Defendant NMFD contends Plaintiff has failed to produce evidence to support his claim that the work place was permeated with hostile discriminatory acts.  *Id.* at 21.

Constructive discharge occurs when "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."  *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986).  "Essentially, a plaintiff must show that he had 'no other choice but to quit.'"  *Yearous  v.*

*Niobrara County Mem'l Hosp*., 128 F.3d 1351, 1356 (10th Cir.1997) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir.1992)).  The conditions of employment must be objectively intolerable; the "plaintiff's subjective views of the situation are irrelevant." *Id*.  The typical constructive discharge claim alleges that an employer created a hostile work environment which rendered working conditions intolerable.

Constructive discharge claims may also be based on other types of intolerable working conditions such as retaliatory conduct for making a complaint of discrimination.  *See Woodward,* 977 F.2d at 1402.  However, "[a] finding of constructive discharge must not be based only on the discriminatory act; there must also be aggravating factors that make staying on the job intolerable." *James v. Sears Roebuck*, 21 F.3d 989, 992 (10th Cir.1994).  Examples of "aggravating factors"  might include a perceived demotion or reassignment to a job with lower status or lower pay, depending on the individual circumstances of each case.  *James*, 21 F.3d at 993.  Courts must therefore examine the "totality of the circumstances." *Yearous*, 128 F.3d at 1356.

In addition, the Tenth Circuit has recognized that where an employee reasonably believes termination motivated by racial bias is inevitable and resigns rather than wait for termination, a constructive discharge actionable under Title VII has occurred.  *See Burks v. Oklahoma Publishing Co.*, 81 F.3d 975, 978 (10th Cir. 1996).  "A finding of constructive discharge is supported by evidence that an employee has resigned, rather than waiting to be fired, because of unreasonably harsh conditions that have been applied to him in a discriminatory fashion." *Spulak v. KMart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990)

In this case, Plaintiff bases his constructive discharge claim on "unreasonably harsh conditions that have been applied to him in a discriminatory fashion" and retaliatory conduct. Besides the incidents already discussed, Plaintiff presented evidence that Defendant Henington had his desk, crew carrier, work locker, and home searched when some chain saws were discovered missing. Pl.'s Resp., Ex. 1, Jaramillo Dep. p. 57-61. According to Plaintiff, he was installing stereos in the crew carriers and needed to get tools and equipment for the installation from the cache. Plaintiff borrowed Ms. Vialpando's key to get into the cache. When Defendant found out Plaintiff had borrowed the key, he got upset and asked Plaintiff if he had made a copy of the key. Plaintiff informed Defendant Henington that he had not. Nonetheless, Defendant Henington took Plaintiff's key chain and looked at all of the keys to make sure Plaintiff had not made a copy.

At some point, some chain saws were missing. Defendant Henington directed Adam Mitchell to search Plaintiff's crew carrier, his desk drawers and his locker. Fearing Defendant Henington would imply he had the chain saws hidden at his home, Plaintiff offered to have his home searched. Defendant Henington accepted the offer and had Mr. Mitchell search Plaintiff's home. Mr. Mitchell went through every drawer in Plaintiff's home, looked under the beds, and looked in his shed. Plaintiff was present when the searches took place. No one else was questioned about the chain saws or searched.

The incident that Plaintiff contends pushed him to resign involved Mr. Martin. Pl.'s Resp., Ex. 1, Jaramillo Dep. p. 26-29. Plaintiff was coming back from work detail in Santa Fe. He was driving his work van and still had his crew. As Plaintiff approached the "pick up area" at the Honor Farm, Mr. Martin was leaving in his crew carrier. The area was posted at five miles an

21

hour.  As Plaintiff and Mr. Martin crossed a narrow bridge, Mr. Martin was traveling at an excessive speed.  Instead of slowing down, Mr. Martin continued at a high rate of speed barely missing hitting Plaintiff's van.  Plaintiff radioed Mr. Martin to slow down.  Mr. Martin responded by directing Plaintiff to "shut up."   When Plaintiff entered the office, Mr. Martin confronted Plaintiff.  Plaintiff claims Mr. Martin used foul language and "gestures,"essentially verbally assaulting him.  Rubina Vialpando witnessed this incident.

Defendant Henington called Plaintiff, Mr. Martin, and Ms. Vialpando into his office.  Mr. Martin continued his abusive behavior in front of Defendant Henington and Ms. Vialpando. Defendant Henington informed Plaintiff that Mr. Martin had a constitutional right to talk to him in any way he wanted.  Plaintiff filed a grievance against Mr. Martin.  Although Defendant Henington witnessed this event, after an investigation, he concluded both Plaintiff and Mr. Martin were at fault.  Mr. Martin was not reprimanded.

After this incident, Plaintiff found it intolerable to continue working under Defendant Henington because of the harassment by Defendant Henington and Mr. Martin.  He applied for and was offered a position with the Department of Health.  After he left the NMFD and was working for the Department of Health, Defendant Henington sent Plaintiff a "revised letter" stating he now understood that foul language in the workplace was not covered under the constitution and therefore Mr. Martin was at fault.

Plaintiff also presented evidence that Defendant Henington demoted him from a Red card to a FFT2 card even though he had the proper certification to retain his firefighter qualifications. Plaintiff also submitted evidence (Santiestevan and Vialpando deposition testimony) that the motivation to force him out was the fact that he was Hispanic.  Given this evidence, Plaintiff has

raised a genuine issue of material fact as to whether a reasonable employee in his position would have found the conditions of employment intolerable and whether a reasonable employee would believe termination motivated by racial bias was inevitable and therefore as to whether his resignation was actually constructive discharge actionable under Title VII.  Accordingly, the Court will deny summary judgment as to this claim.

Having denied summary judgment as to Plaintiff's Title VII constructive discharge claim and viewing the evidence in the light most favorable to Plaintiff, the Court also finds that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant Henington's reasons for the adverse employment actions are pretextual.  Accordingly, the Court will deny summary judgment as to Plaintiff's Title VII racial discrimination claim.

### 3.  Title VII Retaliation Claim

Under Title VII "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The Court also considers Plaintiff's retaliation claim under the burden-shifting framework set forth in *McDonnell Douglas.  See also Wells v. Colorado Dep't of Transp.,* 325 F.3d 1205, 1212 (10th Cir. 2003).

Under this burden-shifting framework, Plaintiff must first establish a *prima facie* case of retaliation.  *Wells,* 325 F.3d at 1212.  If Plaintiff establishes a *prima facie* case of retaliation, then the burden of production shifts to Defendant Henington to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  If Defendant Henington meets his

burden, then summary judgment is warranted unless Plaintiff can show that there is a genuine issue of material fact as to whether the reasons for the adverse employment action proffered by Defendant Henington are pretextual.  *Id.*

### a. *Prima Facie* Case

In order to make out a *prima facie*,  Plaintiff must show the following:  (1) he engaged in protected activity; (2) Defendant Henington took an adverse action against him; and (3) there exists a causal connection between the protected activity and the adverse action.  *Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998).  Moreover, "[a] plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of [his] underlying complaint is adjudged to violate Title VII." *Id.*, *see also*,  *Archuleta v. Colorado Dep't of Instr., Div. of Youth Servs.*, 936 F.3d F.2d 483, 487 (10th Cir. 1991)("Clearly, a plaintiff need not be successful on an original charge of discrimination in order to have a valid claim of retaliation.").

### i)  Protected Activity

The factual basis for Plaintiff's retaliation claim is that he (1) complained about "unfair" treatment by Defendant Henington because he is Hispanic, and (2) complained about Mr. Martin's harassing behavior yet Defendant Henington did not discipline Mr. Martin for the harassment or stop the behavior.  Plaintiff has presented sufficient evidence to support these claims.

### ii)  Adverse Action

Plaintiff claims Defendant Henington took adverse action against him for complaining about the harassment and for his complaints of disparate treatment.  "To be an adverse action, the employer's conduct must be 'materially adverse' to the employee's job status." *Wells,* 325 F.3d

24

at 1213.  In this circuit, conduct constitutes adverse employment action when it results in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1241 (10th Cir.2002).  Moreover, in *Gunnell v. Utah Valley State College*, 152 F.3d 1253 (10th Cir.1998), the Tenth Circuit found that coworker hostility and harassment, if sufficiently severe, qualified as an adverse employment action.  *Id.* at 1264.

Plaintiff claims he had the proper certification to retain his firefighter qualifications. Nonetheless, Defendant Henington downgraded him from a Red card to a FFT2.  This change in certification significantly affected Plaintiff's duties, responsibilities, and opportunity to advance in his career.  To support this claim, Plaintiff submitted the deposition testimony of Rubina Vialpando.  Pl.'s Resp. Def.'s Mem. Supp., Ex. 3, Vialpando Dep. p. 15-16.  As the training specialist for the type 2 team for eight years, it was Ms. Vialpando responsibility to know the fire qualifications system under the NWCG.  *Id.* at 16.  Ms. Vialpando testified Plaintiff had the qualifications to retain his Red card certification.  *Id.*  Ms.Vialpando also testified she informed Defendant Henington that Plaintiff had the qualifications to retain his Red Card and should not be downgraded.  *Id.*  Ms. Vialpando testified Defendant Henington responded by reminding Ms. Vialpando that she was not Plaintiff's supervisor and, as Plaintiff's supervisor, Defendant Henington had made the decision to downgrade him.  *Id.*  Significantly, Ms. Vialpando testified she was aware of Anglo employees who did not qualify for the certification but were allowed to keep their certification and were not downgraded.  Ms. Vialpando named Shelby Martin and Adam Mitchell as two examples of this discriminatory practice.  *Id.* at 16-17.  Ms. Vialpando also

testified to the disparate treatment Plaintiff received in comparison to Anglo employees in similar situations.  Ms. Vialpando testified Defendant Henington allowed the Anglo employees to attend training and were not reprimanded for violations of work rules.

Ivan Santistevan's deposition testimony also supports Plaintiffs allegations of retaliatory treatment, disparate treatment, and racial discrimination.  Pl.'s Resp. Def.'s Mot. Summ J., Ex. 2 p.6-13.  Mr. Santistevan testified he, along with other employees, felt intimidated by Defendant Henington because of the "ramifications they might face" if they said anything negative about him or if they provided information or testified on Plaintiff's behalf.  *Id.* at 6.  Significantly, Mr. Santistevan testified, "working under him, working directly under him supervising the crew supervisors, I have experienced that <u>people that do make some sort of complaint are targeted for some type of career destruction or harassment to the point where they are forced to resign or they just can't stand being there any longer and they end up resigning and just leaving there</u>."  *Id.* at 7 (emphasis added).  Notably, Mr. Santistevan testified Defendant Henington targeted "mostly" Hispanics.  *Id.* at 6.  Mr. Santistevan also testified Anglo employees were given more training opportunities and fire opportunities.  *Id.* at 21.  According to Mr. Santistevan, a lack of fire assignments and training would limit an individual's promotional opportunities.  *Id.* at 18.

Mr.  Santistevan testified to one incident in which Defendant Henington directed him to "target a certain employee to force him to resign, to turn in his resignation, and [Mr.Santistevan] . . . didn't feel comfortable with that."  *Id.* at 8.  According to Mr. Santistevan's testimony, Defendant Henington called him on the radio to meet with him at a certain location.  Mr. Santistevan agreed and met Defendant Henington at the specified location.  Defendant Henington explained to Mr. Santistevan that Weegee Montoya had complained about Defendant Henington

and had requested mediation.  Defendant Henington informed Mr. Santistevan that at the mediation he would recommend Mr. Santistevan supervise Mr. Montoya.  Once under his supervision, Defendant Henington directed Mr. Santistevan to "just keep the pressure on him." *Id.* at 9.  Mr. Santistevan testified Defendant Henington told him "I think we can have him out of here fairly quick if you keep the pressure on." *Id.*

The following week Mr. Santistevan received an e-mail informing him Mr. Montoya was now under his supervision. *Id.* at 10.  Uncomfortable with Defendant Henington's directive and "in combination with all the other unethical things [he] had been observing," Mr. Santistevan met with Defendant Henington the following week.  Defendant Henington informed Mr. Santistevan "I think Weegee is about to resign.  I think we'll have him within the next couple of weeks." *Id.* Mr. Santistevan testified he had built his courage up and told Defendant Henington "I think I can work with Weegee.  Please let me work with him.  If we can turn him around, it would be better for us.  I think I can work with the guy."  Defendant Henington responded, "Are you turning on me?"  Mr. Santistevan explained to Defendant Henington, "No, I am not.  It has nothing to do with that.  It doesn't have to be like that.  I think I can work with the guy.  Let me work with him." *Id.*  According to Mr. Santistevan, Defendant Henington responded,  "Well, I'm sorry to hear that."  Mr. Santistevan testified Defendant Henington had an "obvious expression and everything was just disappointment," and told him, "Do whatever you have to." *Id.*  Later that week Defendant Henington sent Mr. Santistevan an e-mail informing him Defendant Henington would resume Weegee Montoya's supervision. *Id.* at 11.

Defendant Henington than targeted Mr. Montoya by excluding him from work activities. As an example, Mr. Santistevan testified Defendant Henington excluded Mr. Montoya from

participating in a fire incident and stated, "I will f— him.  I'll exclude him.  I'll f— with his mind."  *Id.* at 11.  Mr. Santistevan testified Defendant Henington targeted other individuals and explained he went along with targeting Mr. Montoya because Defendant Henington assured him the State Forester was behind him.

Mr. Santistevan also testified about the other individuals Defendant Henington had targeted in the past, Plaintiff, Daniel Montano, Raul Padilla, Weegee (Wilfred) Montoya, and Rubina Vialpando.  *Id.* at 15.  *Id.*  According to Mr. Santistevan's testimony, Defendant Henington directed him to pressure Daniel Montano into resigning.  Defendant Henington was going to write up Mr. Montano for insubordination but directed Mr. Santistevan to "go to Daniel and just mention to him that you think he's going to get terminated, that we're pushing termination."  *Id.*  According to Mr. Santistevan, Defendant Henington stated, "Maybe he will turn in his resignation to avoid being fired.  If he quits, at least there is no recourse he can take, he quit."  *Id.* at 14.  Mr. Santistevan did as directed and Mr. Montano resigned.

Mr. Santistevan testified he felt he was under duress to follow Defendant Henington's directives because, if he had not done what Defendant Henington directed him to do, "[he] wouldn't be in the position [he] was in right now.  [H]e would still be a crew supervisor or probably even – [H]e would have already quit probably."  *Id.*  Mr.Santistevan questioned whether he got "promoted strictly just to do [Defendant Henington's] dirty deeds."  *Id.*  Mr.Santistevan explained the employees were scared of Defendant Henington because of his relationship with the division director and the bureau chief.  Mr. Santistevan testified the bureau chief had been Defendant Henington's best man at his wedding.  *Id*. at 15.  In addition, Defendant Henington, the

28

division director, and the bureau chief were all hunting buddies.   Based on the foregoing, the

Court finds that Plaintiff has shown Defendant Henington took adverse action against him.

### iii)  Causal Connection

Plaintiff also has met his burden of establishing a causal connection between the protected

activity and the adverse action.  Plaintiff's evidence established that after he complained about

"unfair treatment" Defendant Henington took retaliatory action against him.  After Plaintiff

complained about Mr. Martin's behavior and the "unfair treatment," the retaliatory action

increased, including denying him training, losing his task books, demoting him to an FFT2,

excluding him from work related activities, and giving him poor evaluations.

### b.  Legitimate, Nondiscriminatory Reason for the Adverse Employment action

Defendant Henington claims he had legitimate business reasons for Plaintiff's Interim PAD

evaluation and the revocation of Plaintiff's Red card certification.  However, viewing the evidence

in the light most favorable to Plaintiff, Plaintiff has presented sufficient evidence to raise a genuine

issue of material fact as to whether Defendant Henington's reasons for the adverse employment

actions are pretextual thus precluding summary judgment.

### 4.  Title VII Gender Discrimination Claim

Plaintiffs also claims "Defendant [Henington] treated [him] differently than a female

employee based on the same incident."  Pl.'s Resp. Def.'s Mem. Mot. Summ. J. at 12.   Plaintiff's

allegation that he was subjected to disparate treatment because he is male is subject to a reverse

discrimination analysis.  As previously noted, Title VII makes it an "unlawful employment

practice for an employer to . . . discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  As in his Title VII racial

discrimination claim, Plaintiff bears the initial burden of establishing a prima facie case of

discrimination.  However, in a reverse discrimination case, the *prima facie* case is adjusted to

reflect the reverse discrimination context of the lawsuit.  *Notari v. Denver Water Dep't*, 971 F.2d

585, 589 (10th Cir. 1992).  In *Notari* the Tenth Circuit stated:

> The *McDonnell Douglas* presumption– that is, the presumption that unless otherwise
> explained, discrimination is more likely than not the reason for the challenged decision– is
> valid for a reverse discrimination claimant only when the requisite background
> circumstances exist.  Thus, we agree that a Title VII disparate treatment plaintiff who
> pursues a reverse discrimination claim, and seeks to obtain the benefit of the *McDonnell*
> *Douglas* presumption, must, in lieu of showing that he belongs to a protected group,
> establish background circumstances that support an inference that the defendant is one of
> those unusual employers who discriminates against the majority.

971 F.2d at 589.

To meet the requirement under *McDonnell Douglas*, Plaintiff contends Defendant

Henington reprimanded him for "whiting-out" his leave form yet did not reprimand Jill Bertram

even though she admitted she had whited-out Plaintiff's leave form.  However, Plaintiff has not

presented evidence to show Defendant Henington is that "unusual employer" who discriminates

against the majority.  In addition, Mr. Santiestvan's deposition testimony alleges Defendant

Henington also targeted Rubina Vialpando, an Hispanic female employee.  Accordingly, the Court

will grant summary judgment as to this claim.

### B.  Breach of Employment Contract

Plaintiff contends he was a permanent public employee not an at-will employee.

Defendant NMFD disputes this contention and claims "[t]here is no evidence or claim that the

employment arrangement here was anything other than at will."  Def.'s Mem. Supp. Mot. Summ.

J. at 22.  In his Complaint, Plaintiff averred his employment was governed by an express and

implied contract of employment.  Compl. ¶ 32.  Plaintiff also averred that Defendant Henington

violated the employment contract "by singling [him] out for adverse employment actions,

including wrongful disciplinary actions based on unproven and unsubstantiated allegations of

wrongdoing."  *Id.* ¶ 33.  Plaintiff further averred that Defendant Henington violated the

employment contract by discriminating against him on the basis of his national origin and sex.

Defendant NMFD moves the Court for summary judgment on this claim asserting

Plaintiff's Complaint "does not allege any specific provisions of any contract or identify exactly

the source of this alleged contractual language."  Def.'s Mem. Supp. Summ. J. at 21.  In response

to Defendant NMFD's argument, Plaintiff contends EMNRD policies and procedures and NMFD

IWC Program policies and procedures "governed the parties' relationship and [] served as a basis

for the parties' employment contract."  Pl.'s Resp. to Def.'s Mem. Supp. Summ. J. at 20.

Additionally, Plaintiff cites to the New Mexico State Personnel Rules and Regulations as a basis

for this claim.

In his response, Plaintiff does not advance any argument or authority in support of his

claim that an express contract of employment governed in this case.  "A litigant who fails to press

a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of

supporting authority or in the face of contrary authority, forfeits the point."  *Phillips v. Calhoun,*

956 F.2d 949, 953-54 (10th Cir.1992) (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d

1017, 1023 (7th Cir.1990)).  Additionally, Plaintiff did not submit any evidence to support his

claim.

As to the the issue of an implied contract of employment, Plaintiff contends "[a]n implied

employment agreement between a state employer and an employee may exist when there are

31

writings with sufficiently concrete representations, such as an employee handbook or personnel policy." *Id.* at 19.   Plaintiff is correct.  *See Barreras v. State of New Mexico Corrections Dep't*, 133 N.M. 313, 315, 62 P.3d 770, 772 (Ct. App. 2002)("We agree with Plaintiffs that an implied contract of employment with a government employer may arise from writings that are sufficiently concrete in their representations, such as an employee handbook or a personnel policy."). Moreover, the State Personnel Act, its related rules and regulations "when considered together with a state agency employee handbook, have 'attributes of an employee contract,' because they control the employer-employee relationship and give rise to reasonable employee expectations." *Id.*

However, Plaintiff also failed to submit any evidence to support this claim.  Plaintiff did not submit the employee handbook or personnel policy or policies upon which he relies.  Plaintiff "may not rest upon mere allegations or denial in the pleadings," in defending a motion for summary judgment.  *See Universal Money Ctrs., Inc.*, 22 F.3d at 1529.  Accordingly, the Court will grant summary judgment as to this claim and Plaintiff's claim for breach of an implied covenant of good faith and fair dealing.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Defendant New Mexico Forestry Division's Motion for Summary Judgment **[Doc. No.  45]** is **GRANTED** as to Plaintiff's claims for (1) Title VII Gender Discrimination, (2) breach of contract, and (3) breach of an implied covenant of good faith and fair dealing.

32

**IT IS FURTHER ORDERED** that Defendant New Mexico Forestry Division's Motion for Summary Judgment is **DENIED** as to Plaintiff's claims for (1) Title VII National Origin Discrimination, (2) Title VII Constructive Discharge, and (3) Title VII Retaliation.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**